97630 westemeir terry 112114 rough

11      A   I'm there.

12      Q   Towards the back of that particular

13   exhibit, Mr. Westemeir, and there are not page

14   numbers or Bates numbers, so I'm not entirely

15   sure how to get you there, but there's some

16   explanation of your education and your

17   certifications.  Do you see that.  It's on two

18   different pages?

19      A   Yes, sir.

20      Q   So you graduated with a bachelor's

21   degree in accounting from the University of

22   Oklahoma in 1976?

23      A   Yes, sir.

24      Q   And then a master's in 1977?

25      A   Yes, sir.

♀

                    8

1      Q   Do you hold a law degree,

2   Mr. Westemeir?

3      A   I do not.

4      Q   And let's go through.  You have a CPA;

5   is that right?

6      A   Correct.

7      Q   And you're accredited -- well, let's go

8   through these one at a time.  Based on your

9   understanding, what is it that your expertise as

10   a Certified Public Accountant, what scope of

11   knowledge would that allow you to offer opinions

12   on, and if that's a bad question, let me know.

**Exhibit 3**

97630 westemeir terry 112114 rough

1    A    In that case I might seek a

2  professional real estate person, a broker, one

3  that does transactions of this kind, a leasing

4  agent might be a source or an attorney.

5    Q    Okay.  But there are some instances in

6  which you think you wouldn't need help because

7  based on your education and training, you

8  yourself would be able to come to a conclusion

9  as to the legal meaning of the terms of the

10  lease?

11        MR. MILLER:  Objection.

12  Mischaracterizes testimony.

13        THE WITNESS:  Yeah.  Not to the legal,

14  no.

15    Q    (BY MR. AVERY)  okay.  So if somebody

16  needed to know the legal meaning of the terms of

17  a commercial contract, they should not come and

18  ask you?

19    A    They should not, and I would not give

20  them a legal opinion.

21    Q    Okay.  Great.  I want to talk about

22  some of your previous testimony, and I think,

23  bear with me, because I don't have the tabs that

24  your attorney has, and maybe I should have.  I

25  know there's an exhibit in here where you've got

19

1  some previous testimony.

2        MR. MILLER:  Off the record.

97630 westemeir terry 112114 rough

48

1    contract?

2        A    Objection to form, please.

3            THE WITNESS:  Again, not the proper

4    interpretation as you coined it, but I will give

5    an interpretation from an accounting based on my

6    experience and my understanding of the

7    agreement.  I will be, you know, as the

8    appropriate accounting in my opinion.

9        Q    (BY MR. AVERY)  So you'll offer

10   opinions as to what you think the contract

11   means?

12       A    I'll give -- I'll give an opinion that

13   the accounting was appropriate and in accordance

14   with my interpretation of the accounting notion

15   expressed in the agreement.

16       Q    And I'm not trying to be coy with you,

17   but to the extent you'll be offering an opinion

18   that the accounting was done in a manner

19   consistent with the contract, as a part of that,

20   you'll need to tell the jury what you think the

21   contract required from an accounting standpoint;

22   is that right?

23       A    I will from an accounting standpoint, I

24   will, based on my experience and my reading of

25   the contract and how it's been similar language

97630 westemeir terry 112114 rough

1    has been applied to other cases, yes, how I
2    would apply the accounting here.
3        Q    Okay.  So that's the first broad
4    category I would say, and, again, I'll go over
5    them again with you, but the fist broad category
6    would be has there been overbilling?  You will
7    be offering opinions related to that, is that
8    accurate?
9        A    That's correct.
10       Q    And the second opinion would be if
11   there has been an overbilling, what is the
12   amount of that overbilling?  Will you be
13   offering an opinion about that?
14           MR. MILLER:  Excuse me.  Please.  I'm
15   sorry.  I lost my train of thought writing.
16   Would it be all right if the reporter read the
17   question back?
18           MR. AVERY:  You bet.  Absolutely.
19           THE COURT REPORTER:  "And the second
20   opinion would be if there has been an
21   overbilling, what is the amount of that
22   overbilling?  Will you be offering an opinion
23   about that?"
24           MR. MILLER:  Thank you.  No objection.
25           THE WITNESS:  I will not because my --


50

1    in this case because I have found that there has

97630 westemeir terry 112114 rough
24   a process there that Tomahawk completely
25   complied with and, you know, Mr. Keeney -- like,

♀

62

1    for example, Mr. Keeney was asked about that
2    yesterday.  He had no idea.  All you have to do
3    is go back to my Exhibit Q, and there is the --
4    an example of where the invoices were rejected
5    because of an unknown or unidentified signer on
6    that and that's the review process they went
7    through, and then there's an e-mail from
8    Marjorie Anderson where she communicates on
9    August 25, 2010, the invoice compliance, what
10   was required of Tomahawk.  So --
11        Q   And that's a lot of information.
12        A   I understand, but timecards.  I mean,
13   and there's a lot of information that goes into
14   my opinions.  The timecard wasn't the proper
15   metric.
16        Q   Fair to say that a summary of that
17   first bullet point is that in your opinion
18   Mr. Keeney started from a flawed premise because
19   he didn't properly understand the billing
20   procedures of ZBJ?
21        MR. MILLER:  Objection to form.
22        THE WITNESS:  Not only the billing
23   procedures of ZBJ and the requirements of
24   Chesapeake of how the services were to be
25   performed according -- back to the master

97630 westemeir terry 112114 rough

♀

63

```
 1     services agreement, how they were to be billed
 2     and how -- what was required before Tomahawk was
 3     paid.
 4          Q    (BY MR. AVERY)  So give me a list of
 5     the processes or requirements that Mr. Keeney
 6     did not understand, both on the ZBJ side and the
 7     Chesapeake side.
 8               MR. MILLER:  Objection.  Calls for
 9     speculation.  Form objection.  Excuse me.
10               THE WITNESS:  Could you repeat the
11     question?
12          Q    (BY MR. AVERY)  Yeah.  You bet.  What I
13     want to understand is your -- as I understand
14     this first bullet, you are indicating that
15     Mr. Keeney in your opinion did not have a proper
16     understanding of certain processes or procedures
17     or requirements, both things that ZBJ did
18     internally, things that Chesapeake required.
19     Can you give me -- let's start with ZBJ.  What
20     -- if I were to write down here what are the
21     internal things at ZBJ that in your opinion
22     Mr. Keeney did not properly understand.
23          A    Is how -- the first one is how they
24     used the timecards at ZBJ.
25          Q    How were the timecards used at ZBJ?
```

97630 westemeir terry 112114 rough

16    maybe for the wrong amount.

17        Q    What about if the person who approved

18    the invoice for Chesapeake didn't know that the

19    work tickets supporting the invoice misstated

20    the amount of work done?

21            MR. MILLER:  Objection as to form.

22        Q    (BY MR. AVERY)  Would it be erroneous

23    for the person to approve that work ticket?

24            MR. MILLER:  Objection as to form.

25            THE WITNESS:  Would it be -- I'm trying

                            105

1    to understand it.  Seems like a double negative.

2    Would he not approve it if he didn't know?

3        Q    (BY MR. AVERY)  Let me say this.

4        A    Okay.  I'm trying to understanding.

5    I'm sorry.

6        Q    That's good.  I want to make sure I get

7    your testimony and you understand the questions.

8    If somebody from ZBJ brought a work ticket to

9    the Chesapeake hand in the field and that work

10    ticket had an erroneous number of hours, it

11    misstated the number of hours worked and the

12    person at Chesapeake nevertheless signed that

13    work ticket approving it, what's the

14    significance of that to you?

15        A    Well, I would think that the

16    significance of that from an accounting

17    standpoint would be that the review process

97630 westemeir terry 112114 rough

18    that's implicated by Chesapeake for that review

19    did not function properly in that case.

20        Q   Okay.  And if that happens, do you

21    think Chesapeake has any recourse against --

22            MR. MILLER:  Objection.

23        Q   (BY MR. AVERY)  -- ZBJ.

24            MR. MILLER:  Objection.  Calls for a

25    legal conclusion.


                          106

1        Q   (BY MR. AVERY)  Do you think Chesapeake

2    has been damaged in that case if they pay the

3    invoice based on that?

4            MR. MILLER:  Objection as to form.

5    Same objection.

6            THE WITNESS:  I don't have an opinion

7    on that.

8        Q   (BY MR. AVERY)  Well, do you have an

9    opinion as to whether or not Chesapeake has been

10    damaged in this case?

11        A   Has Chesapeake been damaged in this

12    case?

13        Q   Yes.  Has Chesapeake Operating,

14    Incorporated, been damaged in this case?  Do you

15    intend to offer an opinion as to whether or not

16    Chesapeake Operating, Inc., has suffered damages

17    as a result of the conduct of either ZBJ or

18    Mr. Amen?  Is that an opinion you intend to

19    offer?

97630 westemeir terry 112114 rough

```
 1     to do that because of weather or whatever.  If
 2     it only took him four and a half hours that day
 3     because of some other reason that he didn't have
 4     to wait as long or whatever, but as Jack and
 5     Zach have said, Jack Amen and Zach have said in
 6     their depositions, it was consistency.  They put
 7     five hours on that -- on that work ticket every
 8     time for waiting time or whatever for that bill,
 9     and that's what was used to generate the
10     invoice.
11          Q   (BY MR. AVERY)  If it took four and a
12     half hours, and the work ticket says five, no
13     problem in your opinion?
14          A   Because sometimes it took six and a
15     half.  Sometimes it took seven.  It was
16     consistency and fairness that they billed, and
17     that was what was on the work ticket.  That was
18     what was agreed to by Chesapeake's people in the
19     field, and it's -- and that's what was billed
20     that was approved.
21          Q   So the approval -- once we sign it, we
22     have no more recourse?
23          MR. MILLER:  Objection as to the
24     question.  Calls for a legal conclusion.
25     Mischaracterizes the testimony, and I don't know
```

113

```
 1     what else, but a lot.
```

97630 westemeir terry 112114 rough

6    timecard, there are payroll records and

7    QuickBooks that we've been able to print out.

8    So you just don't have to -- the hours are there

9    that they worked.

10        Q    (BY MR. AVERY)  So you would just find

11   another source of their hours?

12        A    Right.

13        Q    Because ultimately the only way to

14   verify the work ticket is to look at the hours

15   from some other source?

16             MR. MILLER:  Objection as to form.

17   Calls for speculation.

18             THE WITNESS:  Yeah.  I don't -- see,

19   you're wanting to back up on the whole thing and

20   really those hours were verified.

21        Q    (BY MR. AVERY)  How?

22        A    By the process of getting them approved

23   at the time of the work being done at -- by

24   Chesapeake at the well.

25        Q    So once we sign it, it's verified?


163

1        A    They review it.

2        Q    So that's a yes?  Once we sign it, you

3    would consider that verified?

4        A    They approved it.  I won't go to the

5    definition of verified and quibble with you on

6    that, but they have approved the invoice.

7        Q    Okay.  Do you submit hourly or do you